IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSHUA KELLY, | : | Civil No. 4:22-CV-1555 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | (Magistrate Judge Carlson) |
| KEVIN KELLNER, et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### I.    Introduction

This prisoner civil rights case, which comes before us for consideration of a motion for summary judgment, (Doc. 50), illustrates a recurring challenge confronting correctional officials who must address the needs of an aging and increasingly infirm inmate population. Occasionally, prisoners encounter mobility issues while incarcerated. These mobility challenges often result in medical recommendations that prisoners be housed on lower tiers in institutions or assigned lower bunks in order to avoid unnecessary and potentially hazardous fall risks. The failure to make or implement such medical accommodations can in turn raise questions regarding whether an inmate's conditions of confinement rise to the level

of a Constitutional infraction under the Eighth Amendment, which prohibits cruel and unusual punishment.

So it is here. Joshua Kelly is a former state inmate who was incarcerated at the State Correctional Institution (SCI) Mahanoy in July and August 2021. At the time of his incarceration, Kelly suffered from a pre-existing spinal condition which limited his mobility and ability to climb stairs. Kelly sought a medical accommodation for this impairment, which was granted on August 2, 2021, when a doctor directed that Kelly be moved to a lower tier housing unit to avoid stair climbing. However, no effort was made to address this medical directive until August 9, 2021, one week later. As Kelly was moving to his new cell, he fell and fractured his orbital bone.

This mishap forms the basis of this prisoner civil rights lawsuit, with Kelly alleging violations of his civil rights by Kevin Kellner, the Unit Manager who was responsible for his cell assignment, Kellner's supervisor, Major Thomas Sokaloski, and the former Corrections Healthcare Administrator at SCI Mahanoy, John Steinhart. According to Kelly, individually and collectively these officials deprived him of his rights under the Eighth Amendment by failing to timely ensure that he was transferred to a cell which accommodated his disabilities.

The defendants have moved for summary judgment in this case, arguing as a matter of law that the undisputed facts do not demonstrate deliberate indifference by

any defendant to Kelly's well-being. As we discuss below, at this juncture, when we are considering a defense motion for summary judgment, we must view the facts in a light most favorable to the plaintiff, Inmate Kelly. Viewing this case through the analytical lens prescribed by law, for the reasons set forth below, this summary judgment motion will be granted, in part, with respect to Defendants Steinhart and Sokaloski, but denied with respect to Defendant Kellner since there are disputed issues of fact concerning the state of Kellner's knowledge regarding the need to transfer Kelly.

## II.    **Statement of Facts and of the Case**

With respect to Kelly's Eighth Amendment claim the pertinent facts can be simply stated: In the Summer of 2021, Joshua Kelly was extradited from Maryland to commence service of a sentence in the Pennsylvania Department of Corrections. (Doc. 51-3). At the time that he arrived in state custody, Kelly suffered from a pre-existing medical condition, a spinal injury suffered as a result of a 2019 industrial accident. (Id., at 8). This condition limited Kelly's ability to walk, stand, and climb stairs or ladders. (Id.) Over time, while in state custody Kelly's condition declined. By August 2021 he was prescribed a cane to assist him in ambulating; by October of 2022, Kelly was confined to a wheelchair. (Doc. 51-5).

Following his extradition in June of 2021, Kelly was initially housed at SCI Smithfield, where his impairments were noted, and he was medically assigned to a

lower bunk. (Docs. 51-3 at 10-12; 51-5). On July 8, 2021, Kelly was transferred to SCI Mahanoy. (Id.) Upon his arrival at this institution Kelly shared his complex medical history with an intake nurse and underwent a two-week quarantine period. (Doc. 51-3 at 10-15).

Kelly was released from quarantine on July 23, 2021, and was housed in the FA unit at the prison. Kelly's unit manager was Kevin Kellner who initially assigned Kelly to an upper tier cell, a cell assignment which required Kelly to climb stairs. (Id. at 15). At the time of this cell assignment, the Department of Corrections had in place a general policy statement governing medical housing accommodations for inmates, DC-ADM-006, which stated in part that:

> The facility's health care department, through qualified personnel or specialists, and in conjunction with the affected inmate, shall make the diagnosis of a qualified disability, unless previously diagnosed, and shall determine the level of accommodation needed and provide the appropriate medical treatment, as required by the condition. Medical staff shall notify facility staff of any impairment.

(Doc. 57-6 at 8).

While this policy called for medical personnel to inform staff of any necessary medically determined accommodations, the means by which this information was to be transmitted was undefined, and in practice at SCI Mahanoy this information was shared in an unstructured and occasionally haphazard manner. For his part, Unit Manager Kellner indicated that in nine out of ten times he first learned of these medical accommodation needs from the inmate. (Doc. 51-6 at 19-20). In addition,

4

Kellner recalled occasionally receiving this information from medical or correctional staff. (Id.) The physician at SCI Mahanoy who examined Kelly and imposed a lower tier restriction on this inmate in August of 2021, Dr. Saikia, stated that these restrictions would be entered into an inmate's computerized medical records, which were accessible to the unit manager, and the inmate would be instructed to inform his unit manager. However, the doctor denied sharing this medical information directly with correctional staff. (Doc. 57-11 at 20-24). Kellner's immediate supervisor Major Thomas Sokaloski, in turn, stated that unit managers were expected to use the prison's computer system, DOCNet, to regularly check on inmate medical status changes and accommodate those medical conditions. (Doc. 51-7 at 12-14).  John Steinhart, the former Corrections Healthcare Administrator at SCI Mahanoy, acknowledged that there was no single standard operating procedure in this field but described a slightly different means of sharing this information, stating that unit managers would rely upon notice through DOCNet, combined with medical provider calls to receive this information. (Doc. 51-8 at 16-21). Notably, Unit Manager Kellner indicated that he was well aware of the vagaries in this system prior to Kelly's injury and estimated that on ten or more occasions there had been delays in receiving medical status information relating to inmate accommodation needs. (Doc. 51-6 at 30-35). Kellner claimed that these communication issues had been discussed with Major Sokaloski but denied that the prior issues had ever led to

5

an inmate injury. (Id.)  For his part, Sokaloski testified that he did not recall any discussions with Kellner or other unit managers concerning problems receiving medical reports of inmate accommodation needs. (Doc, 51-7 at 14-16).

It was against this backdrop that Kelly's medical concerns remained unaddressed until the date of his fall and injury, August 9, 2021. On this score, Kelly's primary point of contact in terms of securing a lower tier cell assignment was his Unit Manager, Kevin Kellner. In fact, Kelly had no communications with Major Sokaloski concerning this issue prior to his August 9 fall, and this issue was never discussed with Mr. Steinhart, who had retired several months earlier in May of 2021. (Doc. 51-3 at 42-46, Doc. 51-8 a 9).

With respect to Kelly's communication of his medical needs to Unit Manager Kellner there is a stark and irreconcilable conflict in the evidence. For his part, Defendant Kellner insists that he first learned of Kelly's lower-tier medical restriction on August 9, 2021 and was in the process of accommodating that restriction when Kelly fell and injured himself. (Doc. Doc. 51-6 at 20-25). Kelly provides a very different account, an account which draws support from some independent corroborating evidence. According to Kelly, shortly after he arrived on Kellner's unit, on July 28, 2021, he fell and required medical attention. (Doc. 51-3 at 19-28). At that time Kelly began pleading his case for a lower tier cell assignment with correctional officers. (Id.) Kelly says that he also discussed this concern twice

with Unit Manager Kellner, who told him that he was awaiting medical documentation before granting this request. (Id.)

That documentation calling for Kelly's placement in a lower tier cell was entered into Kelly's files by Dr. Saikia on August 2, 2021 after a sick call encounter between Kelly and the doctor. (Id.) Two days later, on August 4, 2021, Kelly was also prescribed a cane, further reflecting the medical evaluation of the severity of his impairment. (Id.) On August 4, 2021—five days before his fall—Kelly communicated in writing directly with Kellner regarding the medical directive instructing him to be placed on a lower-tier cell, stating:

> I'm requesting to know when I will be moved to the bottom tier so I don't have to continue struggling up/down the steps in pain? On 8/2/2021 [the doctor] made me bottom bunk bottom tier status an [sic] I also have a walking cane now.

(Doc. 57-12).

There is no evidence that Kellner ever responded to this inmate request or took any action to move Kelly to a lower tier cell until August 9, 2021, the day Kelly fell suffering a fractured orbital bone.

Following this injury Kelly filed a grievance against Unit Manager Kellner, alleging his indifference to Kelly's medical needs. This grievance was initially reviewed and denied by Major Sokaloski. That decision was then upheld upon appeal. (Doc. 51-9).

On these facts, Kelly filed a complaint with this court naming Unit Manager Kellner, Major Sokaloski, and the former Corrections Healthcare Administrator at SCI Mahanoy, John Steinhart. as defendants. (Doc. 1).   According to Kelly, individually and collectively these officials deprived him of his rights under the Eighth Amendment by failing to timely ensure that he was transferred to a cell which accommodated his disabilities. The defendants have now moved for summary judgment on this claim, asserting that Kelly has failed to establish either supervisory civil rights violations or any deliberate indifference to his safety by any of the defendants. (Doc. 50). This motion is fully briefed and is, therefore, ripe for resolution. Mindful of the fact that, at this stage, we must resolve all factual disputes in favor of Kelly, for the following reasons the summary judgment motion will be granted with respect to Defendants Sokaloski and Steinhart but denied as to Unit Manager Kellner.

## III.   **Discussion**

### A. **Summary Judgment – Standard of Review**

The defendants have has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Through summary adjudication, a court is empowered to dispose of those

claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ.

P. 56(a), and for which a trial would be "an empty and unnecessary formality."

Univac Dental Co. v. Dentsply Int'l, Inc., 702 F.Supp.2d 465, 468 (M.D. Pa. 2010).

The substantive law identifies which facts are material, and "[o]nly disputes over

facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a

sufficient evidentiary basis that would allow a reasonable fact finder to return a

verdict for the non-moving party. Id., at 248-49.

The moving party has the initial burden of identifying evidence that it believes

shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec.

& Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown

that there is an absence of evidence to support the non-moving party's claims, "the

non-moving party must rebut the motion with facts in the record and cannot rest

solely on assertions made in the pleadings, legal memoranda, or oral argument."

Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006), accord

Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails

to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden at trial," summary

judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also

appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id., at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F. Supp. 474, 482 (D.N.J. 1995). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark New Jersey v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982); see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is

also not sufficient." <u>Lockhart v. Hoenstine</u>, 411 F.2d 455, 458 (3d Cir. 1969).

Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon

bare assertions, conclusory allegations or suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338,

341 (3d Cir. 1985) (citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, it is emphatically not the province of the court to weigh evidence or

assess credibility when passing upon a motion for summary judgment. Rather, in

adjudicating the motion, the court must view the evidence presented in the light most

favorable to the opposing party, <u>Anderson</u>, 477 U.S. at 255, and draw all reasonable

inferences in the light most favorable to the non-moving party. <u>Big Apple BMW,</u>

<u>Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). Where

the non-moving party's evidence contradicts the movant's, then the non-movant's

must be taken as true. <u>Id.</u> Additionally, the court is not to decide whether the

evidence unquestionably favors one side or the other, or to make credibility

determinations, but instead must decide whether a fair-minded jury could return a

verdict for the plaintiff on the evidence presented. <u>Anderson</u>, 477 U.S. at 252; <u>see</u>

<u>also</u> <u>Big Apple BMW</u>, 974 F.2d at 1363. In reaching this determination, the Third

Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not
> match, item for item, each piece of evidence proffered by the movant.
> In practical terms, if the opponent has exceeded the "mere scintilla"
> threshold and has offered a genuine issue of material fact, then the court
> cannot credit the movant's version of events against the opponent, even
> if the quantity of the movant's evidence far outweighs that of its

> opponent. It thus remains the province of the fact finder to ascertain the
> believability and weight of the evidence.

Id. In contrast, "[w]here the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no genuine issue for trial." Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal

quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d

464, 476 (3d Cir. 2011).

## B. **Supervisory Liability—Guiding Principles**

Kelly's complaint names two supervisory officials—Major Sokaloski and the

former Corrections Healthcare Administrator at SCI Mahanoy, John Steinhart—as

defendants. As to these supervisory and grievance officials, it is well settled that a

claim of a constitutional deprivation cannot be premised merely on the fact that the

named defendants were government officials or supervisors when the incidents set

forth in the complaint occurred. Quite the contrary, to state a constitutional tort

claim, the plaintiff must show that the defendants actively deprived him of a right

secured by the Constitution. Morse v. Lower Merion School Dist., 132 F.3d 902 (3d

Cir. 1997); see also Maine v. Thiboutot, 448 U.S. 1 (1980). Constitutional tort

liability is personal in nature and can only follow personal involvement in the alleged

wrongful conduct shown through specific allegations of personal direction or of

actual knowledge and acquiescence in the challenged practice. Robinson v. City of

Pittsburgh, 120 F.3d 1286 (3d Cir. 1997). In particular, with respect to supervisory

officials, it is well established that: "A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).

As the Supreme Court has observed:

> Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. . . . See Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); see also Dunlop v. Munroe, 7 Cranch 242, 269, 3 L.Ed. 329 (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); Robertson v. Sichel, 127 U.S. 507, 515-516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

Ashcroft v. Iqbal,  556 U.S. 662, 676 (2009).

Applying these benchmarks, courts have frequently held that, in the absence of evidence of supervisory knowledge and approval of subordinates' actions, a

plaintiff may not maintain an action against supervisors based upon the misdeeds of their subordinates. O'Connell v. Sobina, No. 06-238, 2008 WL 144199, * 21 (W.D. Pa. Jan. 11, 2008); Neuburger v. Thompson, 305 F. Supp. 2d 521, 535 (W.D. Pa. 2004). Rather, "[p]ersonal involvement must be alleged *and is only present where the supervisor directed the actions of supervisees or actually knew of the actions and acquiesced in them*." Jetter v. Beard, 183 F. App'x 178, 181 (3d Cir. 2006) (emphasis added).

Nor can an inmate sustain a supervisory liability claim against prison supervisors by simply alleging in a talismanic fashion that they failed to adequately train, oversee or supervise their subordinate employees. In this regard, we note that "[n]umerous courts, including this one, have expressed uncertainty as to the viability and scope of supervisory liability after Iqbal." Bistrian v. Levi, 696 F.3d 352, 366 n.5 (3d Cir. 2012) (quoting Santiago v. Warminster Twp., 629 F.3d 121, 130 n.8 (3d Cir. 2010)). To the extent that supervisory liability survives after Iqbal, the scope of that liability is clearly and narrowly defined. As the Court of Appeals has observed:

> "There are two theories of supervisory liability" one under which supervisors can be liable if they "established and maintained a policy, practice or custom which directly caused [the] constitutional harm," and another under which they can be liable if they "participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations."

Santiago, 629 F.3d at 129 n.5 (quoting A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile

Det. Ctr., 372 F.3d 572, 586 (3d Cir.2004)).

When supervisory liability is premised upon allegations that a supervisor

established or maintained a policy which directly caused a constitutional injury:

> A plaintiff must also allege that the policy or custom was the
> "proximate cause" of his injuries. See Kneipp v. Tedder, 95 F.3d 1199,
> 1213 (3d Cir. 1996). He may do so by demonstrating an "affirmative
> link" between the policy or custom and the particular constitutional
> violation he alleges. Bielevicz, 915 F.2d at 850 (internal quotation
> marks omitted). This is done for a custom if [the plaintiff] demonstrates
> that [the defendant] had knowledge of "similar unlawful conduct in the
> past, ... failed to take precautions against future violations, and that [its]
> failure, at least in part, led to [his] injury." Id. at 851.

Est. of Roman v. City of Newark, 914 F.3d 789, 798 (3d Cir. 2019).

Furthermore, to the extent that an inmate's supervisory liability claims rest on

the premise that prison supervisors did not after-the-fact act favorably upon past

grievances, it is well settled that an inmate cannot sustain a constitutional tort claim

against prison supervisors based solely upon assertions that officials failed to

adequately investigate or respond to his past grievances. Inmates do not have a

constitutional right to a prison grievance system. Speight v. Sims, 283 F. App'x 880

(3d Cir. 2008) (citing Massey v. Helman, 259 F.3d 641, 647 (7th Cir. 2001) ("[T]he

existence of a prison grievance procedure confers no liberty interest on a prisoner")).

Consequently, dissatisfaction with a response to an inmate's grievances does not

support a constitutional claim. See Alexander v. Gennarini, 144 F. App'x 924 (3d

Cir. 2005) (involvement in post-incident grievance process not a basis for § 1983 liability); Pryor-El v. Kelly, 892 F. Supp. 261, 275 (D. D.C. 1995) (holding that prison officials' failure to comply with grievance procedure is not actionable because prison grievance procedure does not confer any substantive constitutional rights upon prison inmates); see also Cole v. Sobina, No. 04-99J, 2007 WL 4460617, at *5 (W.D. Pa. Dec. 19, 2007) ("[M]ere concurrence in a prison administrative appeal process does not implicate a constitutional concern").

As the Third Circuit observed when disposing of a similar claim by another inmate:

> Several named defendants, such as the Secretaries of the Department of Corrections or Superintendents, were named only for their supervisory roles in the prison system. The District Court properly dismissed these defendants and any additional defendants who were sued based on their failure to take corrective action when grievances or investigations were referred to them. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*); see also Antonelli v. Sheahan, 81 F.3d 1422, 1430 (7th Cir. 1996) (state's inmate grievance procedures do not give rise to a liberty interest protected by the Due Process Clause).

Pressley v. Beard, 266 F. App'x 216, 218 (3d Cir. 2008). Indeed, as to such claims, the Court of Appeals has held that summary dismissal is appropriate "because there is no apparent obligation for prison officials to investigate prison grievances." Paluch v. Sec'y Pennsylvania Dept. Corr., 442 F. App'x 690, 695 (3d Cir. 2011) (citing Inmates of Attica Corr. Facility v. Rockefeller, 477 F.2d 375, 382 (2d Cir.

1973)). <u>See</u> <u>Brown v. Wetzel</u>, No. 1:21-CV-1828, 2022 WL 2951454, at *7–8 (M.D.

Pa. Apr. 27, 2022), <u>report and recommendation adopted,</u> No. 1:21-CV-01828, 2022

WL 2919283 (M.D. Pa. July 25, 2022).

## C. **<u>Application of the Eighth Amendment to Medically Prescribed Inmate Cell Placement Instructions.</u>**

At bottom, this case involves a recurring issue in corrections; namely, when

does the failure to timely accommodate a medically prescribed lower-tier or lower-

bunk housing requirement rise to the level of a violation of the Eighth Amendment?

As to this question, the controlling legal guideposts can be simply stated:

> The Eight Amendment protects prisoners from the infliction of cruel
> and unusual punishment. U.S. Const. amend. VIII. To prevail on any
> Eighth Amendment claim, an inmate must show: (1) a deprivation that
> is objectively, "sufficiently serious;" and (2) "a sufficiently culpable
> state of mind" of the defendant official. <u>Farmer v. Brennan,</u> 511 U.S.
> 825, 834 (1994). A prison official acts with deliberate indifference to
> an inmate's serious medical need when he "knows of and disregards an
> excessive risk to inmate health or safety; the official must both be aware
> of facts from which the inference could be drawn that a substantial risk
> of serious harm exists, and must also draw the inference." <u>Farmer,</u> 511
> U.S. at 837.
>
> Claims involving failure to assign a proper bunk to accommodate an
> inmate's medical needs are considered conditions of confinement
> claims pursuant to the Eighth Amendment's prohibition on cruel and
> unusual punishment. <u>See Glazewski v. Corzine</u>, 385 F. App'x 83, 89
> (3d Cir. 2010) (treating allegations of being given a top bunk as part of
> a conditions of confinement claim); <u>Little v. Ebbert</u>, No. 1:17-CV-
> 01915, 2018 WL 6504201, at *4 (M.D. Pa. Dec. 11, 2018).
>
> To succeed on an Eighth Amendment conditions of confinement claim,
> a plaintiff must demonstrate both an objective element – that the
> deprivation was sufficiently serious, and a subjective element – that the

prison officials acted with a sufficiently culpable mind. <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991). Prison conditions may objectively violate the Eighth Amendment proscription against cruel and unusual punishment when inmates are deprived of "the minimal civilized measure of life's necessities." <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981). Such necessities include food, clothing, shelter, medical care and reasonable safety. <u>Tillman v. Lebanon Cnty. Corr. Facili</u>ty, 221 F.3d 410, 418 (3d Cir. 2000). "Whether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in <u>Estelle</u>." <u>Wilson</u> at 303.

"Deliberate indifference" in this context is a subjective standard: "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 125 (3d Cir. 2001). It is not sufficient that the official should have known of the risk. <u>Id</u>. at 133. A plaintiff can, however, prove an official's actual knowledge of a substantial risk to his safety "in the usual ways, including inference from circumstantial evidence." <u>Farmer</u>, 511 U.S. at 842. In other words, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." <u>Id</u>.

<u>Cameron v. Swartz</u>, No. 2:17-CV-00816-AJS, 2020 WL 7496317, at *5 (W.D. Pa. Nov. 19, 2020), <u>report and recommendation adopted,</u> No. 2:17-CV-00816-AJS, 2020 WL 7490229 (W.D. Pa. Dec. 21, 2020). Applying these guideposts, an inmate like Kelly may establish an Eighth Amendment claim when the evidence reveals a knowing failure by staff to accommodate a medical directive instructing staff to place the prisoner in a lower tier, lower bunk cell. <u>See.eg</u>., <u>Little v. Ebbert</u>, No. 1:17-CV-01915, 2018 WL 6504201, at *7 (M.D. Pa. Dec. 11, 2018). Thus, "if a reasonable jury could conclude that one or more [defendants] knew that

[the inmate] should have been housed on the lower tier, and that those [defendants] were able to have him assigned to the lower tier but did not do so, it follows that a reasonable jury could infer that [defendants'] failure to have him housed on the lower tier was deliberate." Zamichieli v. Pennsylvania Dep't of Corr., No. 19-3305, 2022 WL 777201, at *4 (3d Cir. Mar. 14, 2022). In contrast, mere negligence in terms of inmate housing decisions will not suffice to state and Eighth Amendment deliberate indifference claim.

It is in the light of these legal cairns that we evaluate the legal sufficiency of Kelly's allegations against the three defendants named in this complaint.

### D. **The Motion for Summary Judgment Will Be Granted in Part and Denied in Part.**

As we have noted, Kelly's complaint names three defendants: Unit Manager Kellner, Major Sokaloski, and the former Corrections Healthcare Administrator at SCI Mahanoy, John Steinhart. (Doc. 1).  According to Kelly, individually and collectively these officials deprived him of his rights under the Eighth Amendment by failing to timely ensure that he was transferred to a cell which accommodated his disabilities.

Turning first to Defendant Steinhart, the former Corrections Healthcare Administrator at SCI Mahanoy, we have little difficulty concluding that Kelly's claims against this defendant fail as a matter of law. It is undisputed that Mr. Steinhart retired in May of 2021, nearly three months prior to Kelly's injuries. Thus,

Kelly does not allege that Steinhart played any role in his cell placement, nor can he. Instead, Kelly seems to endeavor to hold Steinhart personally liable for an injury he suffered months after Steinhart's retirement based upon what he views as the failure to adopt more rigorous procedures  for communicating inmate accommodation needs to correctional staff.

However, in our view this is simply too temporally and topically remote a connection to sustain supervisory civil rights liability in this case. The fact that Steinhart had left the Department of Corrections months before this incident is fatal to any attempt to blame him as a supervisor of allegedly adopting a constitutionally infirm procedure which was the proximate cause of Kelly's injury. Further, while there is some evidence of communication shortcomings when it came to transmitting notice of inmate medical restrictions to unit managers, it is also clear that at least three avenues of communication were believed to exist: direct reports by prisoners; review of DOCNet computerized treatment notes by unit managers; and direct calls from medical staff to unit managers.  And while these is also some indication of prior occasions when there were delays before unit managers received this medical information, there is no evidence that any delay led to an inmate injury. Therefore, at most, the failure to impose more rigorous and structured reporting procedures amounted to negligence, and did not constitute deliberate indifference to Kelly's safety. Finally, we note that the evidence—while contested—indicates that Kellner

was actually notified by Kelly both of his medical impairments and of the medical directive that he be placed on a lower-tier cell on August 4, 2021, at least five days prior to Kelly's injury. Therefore, the reporting system as described by Defendant Kellner, which relied upon the inmate self-reporting his medical limitations, arguably appears to have worked in this case placing Kellner on notice days before this injury of Kelly's need for a lower-tier cell.

Similar considerations lead us to conclude that, while Kelly's claims against Major Sokaloski present a somewhat closer case, these claims still fail to meet the rigorous standards required by law for supervisory civil rights liability. To be sure, unlike Steinhart, Sokaloski held a supervisory post at the prison in August of 2021 when Kelly suffered his injury. Further, Unit Manager Kellner has testified that the issue of delays in receiving medical information had recurred in the past and was discussed with Sokaloski. However, it remains undisputed that, first, Sokaloski played no role the making housing decisions for Kelly; second, Kelly never discussed his concerns with Sokaloski prior to his August 9, 2021 injury; and third, according to Kellner the communication delays that were discussed by unit managers with Sokaloski had never led to an inmate injury prior to August 2021. On these facts, we conclude that any failure by Sokaloski to impose more rigorous and structured reporting procedures prior to August 2021 amounted to nothing more than negligence and did not constitute deliberate indifference to Kelly's safety. Finally,

it is well-settled that Kelly may not premise civil rights liability upon Major Sokaloski based upon the defendant's failure to act more favorably upon a grievance that Kelly submitted after-the-fact regarding this incident.

The same cannot be said for Unit Manager Kellner. At this juncture, where we are obliged to view the evidence in a light most favorable to Kelly, we conclude that there are unresolved issues of fact which preclude summary judgment in favor of Mr. Kellner. As unit manager Kellner was responsible for implementing medically determined housing accommodations for Kelly. The evidence indicates that prior to August 2, 2021, Kelly fell and discussed his medical impairments several ties with Kellner who told him that he was awaiting medical documentation before transferring Kelly to a lower-tier cell. That medical documentation was prepared by Dr. Saikia on August 2, 2021, a full week prior to Kelly's injury fall, and was available to Kellner through DOCNet. Further, by August 4, 2021—five days prior to his injury—Kelly wrote directly to Kellner asking:

> I'm requesting to know when I will be moved to the bottom tier so I don't have to continue struggling up/down the steps in pain? On 8/2/2021 [the doctor] made me bottom bunk bottom tier status an [sic] I also have a walking cane now.

(Doc. 57-12).

Despite these instructions and entreaties, it is Kellner's testimony that he made no effort to move Kelly until August 9, 2021, the day the plaintiff fell and suffered injuries while attempting to navigate the upper tier stairs. While we

22

appreciate that Kellner's position is also that he first learned of Kelly's lower-tier restrictions on August 9, at a minimum, this evidence presents a disputed issue of fact concerning the state of Kellner's knowledge which must be addressed at trial. Moreover, we are mindful of the Third Circuit's admonition in this setting that: "if a reasonable jury could conclude that one or more [defendants] knew that [the inmate] should have been housed on the lower tier, and that those [defendants] were able to have him assigned to the lower tier but did not do so, it follows that a reasonable jury could infer that [defendants'] failure to have him housed on the lower tier was deliberate." Zamichieli v. Pennsylvania Dep't of Corr., No. 19-3305, 2022 WL 777201, at *4 (3d Cir. Mar. 14, 2022). Here, the evidence—while vehemently disputed—permits an inference that Kellner knew that Kelly should have been housed on a lower-tier cell and had the power to assign him to a lower tier cell, bur delayed making this assignment for a week. Therefore, "it follows that a reasonable jury could infer that [defendant's] failure to have him housed on the lower tier was deliberate." Id. Accordingly, the claim against Defendant Kellner is not subject to summary judgment dismissal but rather should be resolved through trial.

## IV.    **Conclusion**

Accordingly, for the foregoing reasons, the defendants' summary judgment motion (Doc. 50), will  GRANTED in part and DENIED in part as follows: summary

judgment will be GRANTED in favor of Defendants Steinhart and Sokaloski but DENIED as to Defendant Kellner.

    An appropriate order follows.


                           *S/ Martin C. Carlson*
                           Martin C. Carlson
                           United States Magistrate Judge

DATED: August 6, 2025